UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

FLOYD SPENCE,                                No. 6:12-cv-00426-HU

    Plaintiff,                          **FINDINGS AND RECOMMENDATION**

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

    Defendant.[1]

Kathryn Tassinari and Brent Wells, Harder, Wells, Baron & Manning, P.C., Eugene, Oregon, for Plaintiff Floyd Spence.

S. Amanda Marshall, United States Attorney, District of Oregon, Portland, Oregon, for Defendant Carolyn W. Colvin.

Adrian L. Brown, Assistant United States Attorney, District of Oregon, Portland, Oregon, for Defendant Carolyn W. Colvin.

Nancy A. Mishalanie, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Seattle, Washington, for Defendant Carolyn W. Colvin.

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013, and is substituted in place of former Commissioner Michael J. Astrue as the defendant in this action. *See* FED. R. CIV. P. 25(d).

Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

Floyd Spence ("Spence") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's decision should be AFFIRMED.

## I. PROCEDURAL HISTORY

Spence applied for DIB and SSI benefits on March 11, 2009. Both of Spence's applications alleged a disability onset date of December 1, 2007. The applications were denied initially on May 20, 2009, and upon reconsideration on July 23, 2009. Spence appeared and testified at a hearing held on August 9, 2010, before Administrative Law Judge ("ALJ") Rudolph Murgo. The ALJ issued a decision denying Spence's claim for benefits on August 20, 2010. Spence then requested review of the ALJ's decision, which was subsequently denied by the Appeals Council on February 11, 2012. As a result, the ALJ's decision became the final decision of the Commissioner that is subject to judicial review. This appeal followed on March 9, 2012.

## II. FACTUAL BACKGROUND

On April 10, 2009, Spence completed an adult function report. At that time, Spence said he was living in a house with family and he reported experiencing difficulty walking, standing up, sleeping, bending over, using his right arm, bathing, using the toilet, and putting on his shoes due to pain in his back, hip, knees,

shoulders, and arms. Spence prepares his own meals on a daily basis, goes grocery shopping, does his own laundry, and takes the garbage out. But Spence said "[i]t would be nice to have a maid and a cook . . . so I would[n't] [reaggravate] my severe injuries." (Tr. 164.) Spence's hobbies include watching television, reading, petting his cats, and taking naps with his cats.

On April 30, 2009, Spence was examined by DeWayde Perry ("Perry"), M.D., of MDSI Physician Group. After conducting a thorough examination and reviewing x-rays of Spence's spine and hips, Perry diagnosed Spence with obesity, a right biceps distal tendon rupture, an acute cervical spine strain, and a chronic lumbar spine strain. In terms of Spence's functional capacity, Perry opined that Spence (1) can stand and walk up to six hours in an eight-hour workday; (2) has no restriction on the number of hours he could sit during an eight-hour workday; (3) does not need any assistive devices; (4) can lift or carry ten pounds frequently and twenty pounds occasionally; (5) can frequently climb and occasionally stoop and crouch, but should not kneel or crawl; and (6) has "no manipulative limitations or relevant visual communicative or workplace environmental limitations." (Tr. 226.)

On May 19, 2009, Richard Alley ("Alley"), M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment ("PRFCA"), wherein he concluded that Spence (1) can lift and/or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull without limitation, unless otherwise specified (exertional limitations); (2) can frequently climb ramp/stairs and balance, and occasionally

Page 3 - FINDINGS AND RECOMMENDATION

climb ladder/rope/scaffolds, stoop, kneel, crouch, and crawl (postural limitations); (3) has no manipulative limitations, with the exception of being able to reach in all directions due to his acute cervical strain; and (4) has no visual, communicative or environmental limitations.

On May 10, 2010, family nurse practitioner James Suiter ("Suiter"), FNP, drafted an addendum to his treatment notes regarding Spence's recent visit to Charnelton Community Health Clinic in Eugene, Oregon. Suiter's addendum states:

> [Spence] has got multiple back and joint pain problems. He says he has had images done. I don't have copies of this. He wants MRI's and CT's done for non-specific findings. I had a very long conversation with him about why and what would be the benefits, and what I could and couldn't do. . . . I told him I am willing to order images, but I need to get the old images first so that I can make comparisons, and that really if he is not willing to see an orthopedist and he is not having any frank symptomatology, I don't know what the benefit of doing extra images [is], [not to mention that] he might have to pay for them out of pocket [but] he is agreeable to that. Please do note I spent an extensive amount of time with this patient trying to explain this. . . . He seems to have a bit of conceptual understanding issues.

(Tr. 265.)

On June 11, 2010, Spence visited Suiter, complaining of "extensive previous injuries including a bicep rupture to his right arm, extensive degenerative disc disease, neck pain with radiation to bilateral arms, scoliosis, left hip pain due to his back pain/sciatica per patient report/thinking, migraines resulting from these pains, and knee pains bilaterally."[2] (Tr. 260) Suiter noted that Spence has "a history of IV drug abuse in the past, and still

---

[2] It does not appear that Spence's medical records were ever made available to Suiter and/or the Charnelton Community Health Center.

Page 4 - FINDINGS AND RECOMMENDATION

Case 6:12-cv-00426-HU   Document 15   Filed 07/18/13   Page 5 of 18

does marijuana." (Tr. 260.) He went on to state: "[Spence] was not interested in several of the medications that I use in our chronic wellness/pain program. These medications included amitriptyline, Neurontin, [and] Ultram, and [Spence] does understand that I cannot prescribe him narcotics at this clinic if he uses marijuana." (Tr. 260.) Ultimately, Suiter "[t]enatively approved [Spence's] referral to an orthopedic and pain specialist," (Tr. 263), since Spence's primary objective was "getting in to see an orthopedist and possibly chronic pain management provider, and processing through his disability claim." (Tr. 261.)[3]

On July 5, 2010, Spence's mother, Joy Karp ("Karp"), drafted a seven-page letter regarding her son's physical and mental well-being. In that letter, Karp stated:

> [Spence] has been injured at work two times I know of. His arm, back, neck, knees, and hips were injured [working as a truck driver]. He was also injured in his back . . . lifting something heavy going up a stairway [as a laborer for Hyland Construction]. Ma[y]be [his] hips and knees also.
>
> . . . .
>
> I took [Spence] to a [doctor] in Eugene [in the 1970s] and he said [Spence] has scoliosis and one leg shorter than the other. . . . [Spence] has always had trouble with his feet also. Scoliosis can be related to neurofibromatosis, which his sister has, and . . . I believe [Spence] may have neurofibromatosis because of the trouble he has had all his life. Dr. Miller

---

[3] Spence reported experiencing increased weakness in his right arm and decreased grip strength, but he "was not able to reproduce his symptomatology with holding [a] heavy object, but he d[id] state that it comes and goes." (Tr. 262.) Suiter also seemed skeptical about Spence's claim that he experienced radiating pain in his lower back and hip. (*See* Tr. 260) ("[Spence] also has lower back pain which is relatively unchanged, radiates straight on his back radiates into his hip particularly his left hip, and then he thinks it radiates down his legs, my concern is that it doesn't always follow a true dermatomal skin tone pattern.")

Page 5 - FINDINGS AND RECOMMENDATION

> diagnosed [Spence] with dyslexia when he was about 12 years old and he fit him with glasses. . . . [Spence] was in a special learning class in high school, and then I took him over to the other school for one on one help. . . . He is very depressed most of the time. . . . He's very sick as far as I see, and unemployable.
> 
> . . . .
> 
> I believe he has degenerative arthritis also. . . . He uses canes . . . to walk a lot.

(Tr. 211-16; 173-74.)

On August 4, 2010, Spence's sister, Angela Hodgin ("Hodgin"), drafted a one-page letter, which stated:

> For the record, I'd like to let [it] be known that my brother Floyd Leslie Spence has been showing increasing pain while standing and walking. I see that he loses balance while standing even with the assistance of a cane. He is very slow in his step when talking; as this happens I see the stress in this task of just trying to do what millions of people do each day. While I was over [on] Christmas [day] 2009, I noticed [his] balance was not like I was use[d] to seeing. I noticed discomfort before, but it is noticeably increasing. I see that sitting is also painful.

(Tr. 218.)

On August 9, 2010, Spence appeared and testified at a hearing before the ALJ in Eugene, Oregon. Although Spence was not represented by counsel, the ALJ informed Spence of his rights and Spence indicated that he wanted to proceed without representation. At the time of the hearing, Spence was 44 years old, 5'11" tall, weighed approximately 235 pounds, and lived in a van on his mother's property, where he "pretty much hang[s] out in the back yard." (Tr. 38.) Spence received his general equivalency diploma ("GED") after dropping out of school the ninth or tenth grade. Spence does not receive Medicaid, Oregon Health Plan benefits or unemployment benefits, but he does receive $200 a month in food stamps. Spence is not actively seeking employment because "[he]

Page 6 - FINDINGS AND RECOMMENDATION

can't work" due to "injuries." (Tr. 45.)  Spence has a criminal history that includes convictions for burglary and possession of marijuana.  Spence testified that he has three or four broken ribs, but admitted that he does not have any x-rays or magnetic resonance imaging ("MRI") scans to confirm this.  He also said he experiences physical pain entering and exiting his vehicle, and that "[t]he medical records are going to say that I'm smoking marijuana, but I'm not at this time." (Tr. 41.)  After discussing Spence's prior history of marijuana and methamphetamine use, the ALJ found it appropriate (for reasons unbeknownst to this Court) to comment on the fact that Spence "look[ed] more like a steroid user."  (Tr. 46.)  Spence acknowledged that he used to be an avid weightlifter and could curl over 120 pounds, but he denied ever using any performance enhancing drugs.

Also on August 9, 2010, the ALJ received testimony from Vocational Expert ("VE") Jaye Stutz ("Stutz").  The ALJ asked the VE to consider a person of Spence's age, education and vocational background, who is able to lift twenty pounds occasionally and ten pounds frequently; stand and sit for six hours in an eight-hour workday; push and pull without limitation; occasionally stoop, kneel, crouch, crawl, and climb ladder, rope and scaffold; and limited in terms of reaching in all directions. After ruling out Spence's past relevant work, the VE testified that an individual with these limitations could perform the jobs of parking lot cashier, electronics worker, and storage facility rental clerk. The ALJ then asked whether a limitation to "sedentary [work based on the hypothetical individual] lifting less" would preclude gainful employment, to which the VE replied: "Considering the hypothetical

Page 7 - FINDINGS AND RECOMMENDATION

you just gave me, I would identify the jobs of . . . stuffer . . . polisher, eyeglass frames . . . [a]nd finally film touch-up inspector." (Tr. 64.)

### III. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

**A.   Legal Standard**

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser*, 648 F.3d at 724.  Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25.  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001); *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience."  *Tackett*

Page 8 - FINDINGS AND RECOMMENDATION

*v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.   The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Spence had not engaged in substantial gainful activity since December 1, 2007, the alleged disability onset date. At the second step, the ALJ found that Spence had the following severe impairments: obesity, chronic lumbar spine strain, and acute cervical spine strain. At the third step, the ALJ found that Spence's combination of impairments were not the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. The ALJ therefore assessed Spence as having the residual functional capacity ("RFC") to perform light work, subject to the following limitations: (1) Spence can sit, stand and walk for about six hours in an eight-hour workday; (2) he can push and pull with his upper and lower extremities without limitation; (3) he can occasionally stoop, kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; and (4) his reach is limited in all directions.

At the fourth step, the ALJ found that Spence is unable to perform any past relevant work. At the fifth step, the ALJ found in light of Spence's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform, including a parking lot cashier, electronics worker and storage rental clerk. Based on the finding that Spence could perform jobs existing in significant

numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act from December 1, 2007, through August 20, 2010.

## IV. STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bray*, 554 F.3d at 1222 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Holohan*, 246 F.3d at 1097. However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## V. DISCUSSION

On appeal, Spence contends that the Commissioner's decision should be reversed for essentially three reasons: (1) the ALJ failed to develop the record concerning Spence's mental

Page 10 - FINDINGS AND RECOMMENDATION

limitations, which rendered the ALJ's step-two severity finding incomplete; (2) the ALJ failed to provide clear and convincing reasons for rejecting Spence's testimony; and (3) the ALJ failed to provide germane reasons for rejecting lay witness testimony.

**A.    Development of the Record**

In an social security case, the ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citation and internal quotation marks omitted).  However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *see also Tonapetyan*, 242 F.3d at 1150 ("When the claimant is unrepresented, . . . the ALJ must be especially diligent in exploring for all the relevant facts.")

Spence's counsel argues that the ALJ should have further developed the record and/or ordered psychological testing regarding Spence's mental limitations because Spence "appears to have an undiagnosed mental condition based upon Nurse Suiter's observation that he was 'extremely tangential' with 'fixated thinking,' anxious, with difficulty staying on task, and requiring 'reinforcement' and redirection." (Pl.'s Br. at 1-2.) As Spence's counsel points out, Suiter also said that Spence "seems to have a bit of conceptual understanding issues" and Spence's mother indicated that Spence "was very depressed most of the time" and "was in a special learning class in high school."

Page 11 - FINDINGS AND RECOMMENDATION

1    These arguments do not negate the fact that it was Spence's
2 duty to prove that he was disabled. *See* 42 U.S.C. § 423(d)(5) ("An
3 individual shall not be considered to be under a disability unless
4 he furnishes such medical and other evidence of the existence
5 thereof as the Commissioner of Social Security may require"); *Clem*
6 *v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) ("[The claimant] has
7 the burden of showing that he is disabled").  "[I]n order to
8 establish the existence of a medically determinable impairment, a
9 claimant must provide medical evidence of signs as well as
10 symptoms." *Garcia v. Astrue*, No. C 08-3833 MHP, 2010 WL 1293376,
11 at *4 (N.D. Cal. Mar. 31, 2010).  "Signs are the result of
12 medically acceptable clinical diagnostic techniques, such as tests,
13 and symptoms are an individual's own perception or description of
14 the impact of his or her physical or mental impairments." *Id.*
15 (citation and internal quotation marks omitted).

16    Spence did not provide the ALJ with any medical evidence
17 demonstrating that he suffers from a medically determinable mental
18 impairment.  The record before the ALJ was neither ambiguous nor
19 inadequate to allow for proper evaluation of the evidence, and
20 substantial evidence supported the ALJ's decision that any
21 cognitive impairment was not severe.[4]   Notably, Spence's
22 applications for benefits did not allege mental impairments as a
23 basis for disability, and Spence previously indicated that he never
24 attended special education classes. (Tr. 160); *Racette v. Astrue*,
25 No. 1:08-cv-01645 GSA, 2010 WL 1286786, at *13 (E.D. Cal. Mar. 29,

---

27    [4] In his written decision, the ALJ concluded that Spence had
the following non-severe impairments: "right bicep distal tendon
28 rupture, right knee pain, and a learning disorder." (Tr. 11.)

Page 12 - FINDINGS AND RECOMMENDATION

2010) ("[I]t is the duty of the ALJ to resolve conflicts in the evidence, not that of the court.")  In fact, despite apparently being diagnosed with dyslexia as a child and dropping out of high school in the ninth or tenth grade, Spence was still able to earn his GED and obtain his commercial driver's license in 2003.[5]  He also had the mental capacity to work independently as a long-haul truck driver in 2004, which required Spence to draft and complete reports and "[u]se . . . technical knowledge or skills."  (Tr. 174.)  In addition, Spence completed an adult function report on April 10, 2009, wherein he (1) provided the following response regarding his ability to follow written and spoken instructions: "[G]reat no problem"; and (2) indicated that his "illness, injuries, or conditions" do not affect his memory, concentration, or ability to understand information.  (Tr. 167.)

The treatment notes provided by Suiter do not warrant departing from the ALJ's rational interpretation of the evidence.[6]  As discussed above, Suiter said Spence "seems to have a bit of conceptual understanding issues" and Suiter made the following observations regarding Spence's psychological/ mental health: "Extremely tangential, requires reinforcement. . . . Anxious at times, hard to stay on track, fixated thinking at times."  (Tr. 261.)  But Suiter never diagnosed Spence with any mental impairment after conducting an examination.  Indeed, Spence specifically

---

[5] There is no medical evidence in the record regarding any diagnosis of dyslexia. (*See, e.g.,* Tr. 168) ("Glasses for reading [because I] had d[y]sle[x]ia as a kid.")

[6] A nurse practitioner is an "other source" rather than an "acceptable medical source" under 20 C.F.R. § 404.1513.

Page 13 - FINDINGS AND RECOMMENDATION

denied "hav[ing] [any] psy[chological] . . . problems" when Suiter proposed that Spence take Neurontin for his physical pain. (Tr. 266.)

The remaining authority Spence cites—footnote three of Social Security Regulation ("SSR") 96-7p—is no more persuasive. SSR 96-7p states:

> The adjudicator must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *9. This language points to a setting where a claimant does not have an identified impairment responsible for his alleged symptoms. Spence's chronic lumbar spine strain and acute cervical spine strain are impairments capable of producing pain and other symptoms. Therefore, the reasoning in footnote three of SSR 96-7p is inapplicable. *See Rose v. Astrue*, Civ. No. 09-762-HU, 2010 WL 4781424, at *14 (D. Or. Sept. 28, 2010) (same).

In short, the ALJ did not err by failing to address evidence of a mental condition at step two, nor did he err by failing to develop the record concerning Spence's mental limitations.

**B.   Adverse Credibility Determination**

In *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999), the Ninth Circuit explained what is required of an ALJ in order to discredit a claimant's symptom testimony:

> Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is

Page 14 - FINDINGS AND RECOMMENDATION

> unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.

*Id.* at 599 (citations omitted). Ninth Circuit case law demonstrates that clear and convincing reasons "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012).

In assessing a claimant's credibility, an ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

In this case, the ALJ gave specific, clear and convincing reasons for discounting Spence's testimony. For example, the ALJ noted that treating nurse practitioner Suiter described Spence as

Page 15 - FINDINGS AND RECOMMENDATION

"a very vague historian" and Suiter's records included the following handwritten notation "? degree of pain he appears to talk in NAD." (Tr. 16, 260, 299); *see Bradshaw v. Nafgizer*, Civ. No. 07-cv-02422-MSK-BNB, 2011 WL 863548, at *6 (D. Colo. Mar. 10, 2011) (stating that "the notation 'NAD' . . . is customarily used by doctors to reflect that the patient is in 'no apparent distress.'")[7] As the ALJ explained "Nurse Suiter's observations support that, at best, [Spence] is an inaccurate historian." (Tr. 16.)

Additionally, the ALJ noted that Spence "presented with a cane during treatment visits that were in expressed contemplation of obtaining social security disability benefits," yet "neither used nor needed an assistive device" when he was examined by Perry on April 30, 2009. (Tr. 13, 224, 279.)  The ALJ also found inconsistencies between Spence's testimony and daily activities and examples of medical noncompliance: "[D]espite [Spence]'s allegations of significant pain and rather extreme allegations of limited mobility, [Spence] washes his own laundry [once a week], cooks on a stove [with some difficulty], makes his bed, loads the diswasher, takes out the garbage, [cleans the toilet and sinks,] and shops for groceries [once or twice a month] without assistance. . . . [Spence] [also] refused multiple medications and other treatment . . . , such as injections, in May 2010." (Tr. 13-14.)  It is also significant that Spence's marijuana use prevented him from being prescribed narcotics for his physical pain and, at

---

[7] Suiter also said that Spence was "not hav[ing] any frank symptomatology" in an addendum drafted on May 10, 2010. (Tr. 293.)

Page 16 - FINDINGS AND RECOMMENDATION

one point, he was "not willing to see an orthopedist" or pain specialist. (Tr. 289, 293.)

In sum, the Court concludes that the ALJ did not err in concluding that Spence's allegations of disabling pain were not fully credible.

**C.   Lay Witness Testimony**

In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence which cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006). Germane reasons for rejecting a lay witness's testimony include "[i]nconsistency with medical evidence," *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), and inconsistencies between the lay witness's testimony and the claimant's presentation to treating physicians or the claimant's activities of daily living. *Barber v. Astrue*, No. 1:10-cv-01432-AWI-SKO, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

In this case, a review of the record reveals that the limited testimony provided by Karp and Hodgin is quite similar to that which was provided by Spence. The Ninth Circuit has "held that when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685,

Page 17 - FINDINGS AND RECOMMENDATION

694 (9th Cir. 2009)); *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing *Valentine* for the same proposition). In accordance with *Molina, Williams* and *Valentine*, the Court concludes that the ALJ provided germane reasons for discrediting Karp's and Hodgin's testimony.

## VI. CONCLUSION

For the reasons stated, the Commissioner's decision should be AFFIRMED.

## VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **August 6, 2013.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **August 23, 2013.** When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 18th day of July, 2013.

/s/ Dennis J. Hubel
_____
DENNIS J. HUBEL
United States Magistrate Judge